# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JERRY STILL,
      Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

Case No. 1:18-cv-837
Cole, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Jerry Still brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application for disability insurance benefits (DIB). This matter is before the Court on plaintiff's Statement of Errors (Doc. 6), the Commissioner's response in opposition (Doc. 10), and plaintiff's reply (Doc. 11).

## I. Procedural Background

Plaintiff protectively filed his application for DIB on October 2, 2015, alleging disability since August 29, 2014, due to herniated discs at L4-5 and L5-S1, hypertension, major depressive disorder, and anxiety disorder. After initial administrative denial of his claim, plaintiff was afforded a hearing before administrative law judge (ALJ) Elizabeth A. Motta on July 17, 2017. Plaintiff, who was represented by counsel, and a vocational expert (VE) testified at the hearing. On November 29, 2017, the ALJ issued a decision denying plaintiff's DIB application. Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2019.

2. The [plaintiff] has not engaged in substantial gainful activity since August 29, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The [plaintiff] has the following severe impairments: lumbar degenerative disc disease; reduced central acuity vision; depression; and anxiety (20 CFR 404.1520(c)).

4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform a reduced range of light work (light work is defined in 20 CFR 404.1567(b)): lift and carry 20 pounds occasionally and 10 pounds frequently; can sit for 6 hours in an 8-hour workday; can stand and/or walk for a combined total of 4 hours in an 8-hour workday; can occasionally climb stairs and ramps; can occasionally balance, stoop, kneel, crouch, and crawl; no climbing ladders, ropes, or scaffolds; no exposure to hazards, such as dangerous machinery, unprotected heights, or driving as part of job duties; no exposure to vibration; no use of foot controls on the left; limited to simple, repetitive tasks; limited to low stress work with no strict production quotas or fast-pace and only routine, static work environment with only few changes in the work setting; and limited to occasional contact with the public, coworkers, and supervisors.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).[1]

---

[1] Plaintiff's past relevant work was as a tractor trailer truck driver, a medium exertion, semi-skilled position. (Tr. 36).

7. The [plaintiff] was born [in] . . . 1972 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (20 CFR 404.1563).

8. The [plaintiff] has a limited education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569 and 404.1569(a)).[2]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from August 29, 2014, through the date of [the ALJ's] decision (20 CFR 404.1520(g)).

(Tr. 26-37).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

---

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of approximately 500,000 unskilled, light jobs in the national economy such as merchandise marker (100,000 jobs), mail clerk (50,000 jobs), and photocopy machine operator (30,000 jobs). The ALJ also found that plaintiff would be able to perform 450,000 unskilled, sedentary jobs such as document specialist (120,000 jobs), ticket checker (60,000 jobs), and addresser (15,000 jobs). (Tr. 37).

(1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Relevant Medical Evidence

#### 1. Plaintiff's workplace injury and initial treatment

Plaintiff, who worked as a semi-tractor trailer driver, sustained an industrial injury in May 2014 when he fell off a truck tailgate while making a delivery. (Tr. 1227-29). Plaintiff saw Dr. Shwetal DeSai, M.D., his primary care physician, on May 5, 2014, complaining of intractable back pain. (Tr. 365-66). A May 7, 2014, lumbar spine MRI showed degenerative changes in the lower lumbar levels. A left paracentral focal disc protrusion at L4-5 resulted in posterior displacement of the left LS nerve root origin and there was broad based disc bulging at L5-S1, resulting in contact without displacement of the left S1 nerve root origin. (Tr. 1442).

Dr. E. Robert Wanat, D.O., an occupational medicine specialist, saw plaintiff on May 8, 2014 for review of his MRI. (Tr. 515-16). Plaintiff complained of "a lot of pain" in his lower

back and continued numbness in his left foot.  Dr. Wanat assessed a lumbar strain, disk protrusion, and lumbar radiculopathy, and he referred plaintiff to an orthopedic specialist.

On May 23, 2014, plaintiff consulted with Dr. Tammy Musolino, M.D., a physical medicine and rehabilitation specialist, in connection with his workers' compensation injury.  (Tr. 509-12).  Dr. Musolino reported that MRIs showed "left sided disk protrusion L4-L5 causing posterior displacement of the left L5 nerve root, mild disk bulge L5-S1, without contacting the left S1 nerve root."  On examination she found tenderness, limited range of motion, back spasms, and positive straight leg raise on the left; diminished sensation in the left L5 and S1 area, including mild "give way" weakness; and slightly antalgic gait on the left.  Dr. Musolino assessed plaintiff with a "disk injury at L4-5 causing L5 nerve root impingement," which she intended to submit to the Bureau of Workers Compensation (BWC).  She recommended epidural steroid injections and possibly surgery if the injections did not provide relief.

In June 2014, a physician in Dr. Wanat's practice examined plaintiff and found tenderness at L3 through S1 on the left side, persistent positive straight leg raise on the left, inability to heel and toe walk, and moderate guarding when getting up and down from his chair and on the exam table.  (Tr. 521-22).  Based on the MRI and the physical findings, plaintiff was assessed as in need of "surgery to repair the herniated lumbar disk."

After undergoing a series of epidural steroid injections at left L5 in September 2014 (Tr. 1073-77), plaintiff consulted with a neurosurgeon, Dr. Arthur Arand, M.D., in October 2014.  (Tr. 549-55).  Plaintiff complained of persistent, moderate to severe, radiating low back pain.  On examination, Dr. Arand found decreased and painful range of lumbar motion, positive left straight leg raise, and paresthesia in the left leg and foot.  Dr. Arand opined that plaintiff had

failed conservative treatment, and he recommended surgery. On December 8, 2014, Dr. Arand performed a left L4-5 hemilaminotomy and diskectomy with a microdissection. (Tr. 448-49).

## 2. Post-surgical treatment

Plaintiff saw Dr. Arand for post-surgery follow-up on December 23, 2014. (Tr. 572-76). Plaintiff reported two days of relief post-surgery followed by the return of worsening back pain and new bilateral leg pain. He rated his pain level as 9/10, and he reported that the pain was more severe than it had been pre-surgery. Plaintiff was walking with a cane. Dr. Arand continued plaintiff on Percocet and requested additional diagnostic testing. A lumbar spine x-ray taken on January 9, 2015, showed mild degenerative changes present in the lumbar spine similar to a November 13, 2011 study. (Tr. 579). A lumbar spine MRI taken the same day showed post-surgical changes at L4-L5; a small amount of fluid within the hemilaminectomy defect; and no recurrent disc herniation. (Tr. 581-82). Plaintiff participated in physical therapy, which did not provide relief, and continued to treat with Dr. Arand until March 2015. (Tr. 425-63, 583-614, 620-22). Dr. Arand referred plaintiff to Dr. Johan Beresh, M.D., at Beresh Pain Management in March 2015 for treatment of his persistent pain. (Tr. 614-19). Plaintiff treated with Dr. Beresh until October 2015 for displacement of lumbar intervertebral disc without myelopathy. (Tr. 468-506). A June 2015 EMG showed postsurgical fibrillations in the lumbar paraspinal muscles but no acute radiculopathy or neuropathy. (Tr. 341).

Plaintiff began treating with a chiropractor, Dr. Matthew Murdock, D.C., on August 24, 2015. Plaintiff complained of radiating pain down the left leg which he rated at a severity level of 8/10 and experienced 90% of the time. Plaintiff also complained of numbness and weakness in his left leg and foot, moderate spasms in the bilateral paraspinals, and moderate to severe pain and decreased lumbar motion. On examination, Dr. Murdock found plaintiff had an antalgic gait

and lean; he was unable to heel to toe walk; he had mild to severe tightness in the lumbar areas, buttocks, hamstrings, quadriceps, and gastroenemius; he had mild to severe tenderness on palpation of the lumbosacral spine; bilateral patella and Achilles reflexes were 1 +; and straight leg raise was positive on the left with pain radiating into the left foot. (Tr. 652). Dr. Murdock assessed post-surgical lumbar disc displacement at L4-5 and lumbosacral neuritis. Yeoman's test was positive bilaterally. Dr. Murdock recommended an MRI, physical therapy (which BWC had denied in July 2015 for lack of supporting documentation), and blood work. (Tr. 653).

Pain management specialist Dr. Nilesh B. Jobalia, M.D., of Cincinnati Pain Centers, Inc., treated plaintiff for left-sided low back and leg pain beginning in October 2015. (Tr. 1246-60, 1475-83). When he first saw plaintiff in October 2015, Dr. Jobalia found on physical examination that plaintiff was "in severe distress secondary to pain." (Tr. 795). He had "no range of motion of his lumbar spine" and "severe tenderness" of the lumbar facets bilaterally, lumbar paraspinals bilaterally, and the SI joints bilaterally. He had gluteal and piriformis tenderness. Reflexes were absent at the left knee and trace at the right knee. Ankle jerks were absent bilaterally. Strength of the left lower extremity was reduced. Straight leg extension was positive on the left in a sitting position and was positive on the right for left-sided leg pain. Dr. Jobalia reported that plaintiff's "initial MRI three days after his injury showed herniated discs at L4-L5 and L5-S1 with compression of the L5 and S1 nerve roots," but only the injury at L4-L5 was allowed. Dr. Jobalia felt that the injury at L5-S1 was clearly due to his injury and should be added to his BWC claim. He opined that plaintiff had suffered "significant neurologic defects" between the time of his original workplace injury and his surgery, and the delay in approval of the surgery/treatment had resulted in residual and permanent nerve damage. Given plaintiff's significant and persistent weakness of the leg, and the possibility that plaintiff could

have a residual type of nerve damage since he had "supposedly decompressed since the time of the surgery," Dr. Jobalia thought transforaminal injections might provide long-term benefits. Further, since plaintiff had "significant increase in pain with movement and prolonged standing" and "significant anatomical abnormality of the lumbar spine," Dr. Jobalia planned to request a lumbar support orthotic brace. (Tr. 796). Plaintiff was fitted for a brace in the office and was to receive it when prior authorization was received. Dr. Jobalia diagnosed plaintiff with lumbar disc displacement without myelopathy and lumbosacral neuritis.

In January 2016, Dr. Jobalia reported that an MRI showed a recurrent disc herniation to the left at L4-L5 and a disc herniation at L5-S1 with some scar tissue and facet arthropathy at the L4-L5 level. Dr. Jobalia recommended that a neurosurgeon review the MRI and provide an opinion. (Tr. 1246).

Dr. Jobalia reported in July 2016 time that a discogram was "positive at 2 levels definitely" and plaintiff therefore had an appointment with a neurosurgeon for the following week. (Tr. 1481). As of September 2016, Dr. Jobalia reported that plaintiff "is simply wanting to get a surgery scheduled," and Dr. Jobalia was continuing plaintiff's medications while the neurosurgeon handled issues with BWC in providing information and getting surgery scheduled for plaintiff. (Tr. 1478). In November 2016, Dr. Jobalia expressed hope that surgery would be approved. (Tr. 1476).

A January 2016 lumbar spine MRI showed a recurrent or residual L4/5 disc protrusion with effacement of the L5 nerve root, L5-S1 noncompressive disc protrusion with left paracentral posterior annular rent, degenerative facet arthropathy at L4-L5 and L5-S1, resulting in mild left foraminal stenosis at L4-L5, and bilateral femoral head avascular necrosis. (Tr. 1264). Plaintiff told Dr. Murdock he was not improving with physical therapy. (Tr. 1262). Dr. Murdock

referred plaintiff to Dr. Jonathan Borden, M.D., a neurosurgeon, for a surgical opinion. (Tr. 1263). The plan was to continue pain management with Dr. Jobalia and to follow up with Dr. Murdock in one month for case management and re-evaluation.

Dr. Borden saw plaintiff on February 19, 2016 for complaints of sharp, shooting back pain that traveled down the left leg which he rated as 9/10. (Tr. 1467-71). Plaintiff complained of numbness and tingling. (Tr. 1467). Dr. Borden noted that low back pain started with a 2014 work injury plaintiff for which plaintiff had undergone an L4-5 partial laminectomy discectomy in 2014. Plaintiff had weakness in the left leg and was using a walker for ambulation. He reportedly had fallen three times and had been hospitalized for one fall during the past year. Plaintiff reported he was in physical therapy but was obtaining minimal pain relief. The goal of physical therapy was to help him walk without tripping or falling. Plaintiff was also currently seeing Dr. Jobalia for pain management.

On neurologic exam, plaintiff's motor strength in the lower extremities was reduced or absent. (Tr. 1469). Plaintiff had atrophy in the left quadricep and the straight leg raise test was positive with axial pain. "Motor" results for the lower extremities were reduced to 2/5 in the left side of the iliopsoas and the quadriceps, trace in the tibialis anterior, and absent in the extensor hallucis longus. Sensory exam showed decreased touch and pinprick at L5-S1 and a "dull left leg." His ankle jerk reflexes on the left were reduced to trace. Dr. Borden reported that plaintiff was "[m]inimal weight bearing on the left leg[,] he uses a walker or cane for ambulation." (Tr. 1470).

Dr. Borden reviewed the "images, with findings: Post lami with decreased t2 L4-5, L5-S1, no active compression." Dr. Borden's assessment was:

1. BWC ALLEGED: other intervertebral disc displacement, lumbosacral region; L5-S1;

10

2.  BWC ALLOWED: Displacement of lumbar intervertebral disc without myelopathy; L4-L5; 3.  Lumbar post-laminectomy syndrome;
4. Chronic lumbar radiculopathy;
5. BWC ALLOWED: Lumbosacral neuritis;
6. Foot drop, left."[3]

Dr. Borden wrote that plaintiff had a "significant foot drop" following his work-related injury and subsequent surgery.  He recommended that plaintiff should use an AFO (ankle foot orthosis) boot for his "severe drop foot on the left" to help prevent falls.  (*Id*.).  Dr. Borden noted that plaintiff was currently seeing Dr. Jobalia and spinal cord surgery had been discussed, which "very well may be necessary."  (Tr. 1470).  Dr. Borden questioned whether a fusion would provide relief since there was "no significant active compression" and he expected the foot drop would be permanent.  (*Id*.).  The plan was to order an L4-5, L5-S1 discography to assesses the concordancy of the pain and a post-discography CT to assess whether a fusion was indicated and for plaintiff to return for follow-up after the discography.  Dr. Borden ordered a Lace Up Ankle Brace.

A CT of the lumbar spine performed on July 6, 2016, revealed a left paracentral and foraminal disc protrusion at L4-5, which abutted the thecal sac and left L5 nerve root, with grade 4 annular tear; an L5-S1 left paracentral disc protrusion which abutted the left S1 nerve root, with grade 4 annular tear; and L4-S1 osteoarthritis.  (Tr. 1472-73).

Dr. Borden saw plaintiff on August 4, 2016 for follow-up after diagnostic testing.  (Tr. 1463-65).  Neurologic testing of the lower extremities disclosed atrophy in the left quadricep and a positive straight leg raise test with axial pain.  (Tr. 1464).  Plaintiff continued to exhibit

_____

[3] Foot drop is a condition characterized by "[l]oss of the ability to bend the ankle so that the foot rises [which] may be due to disorders of the lower spinal cord or of the nerves to the muscles that flex the ankle.  Foot drop seriously interferes with walking.  A foot brace may be necessary.  https://medical-dictionary.thefreedictionary.com/Foot+drop.

decreased motor strength in the left lower extremity ranging from absent to 4/5. Sensation was reduced in the left leg and reflexes were diminished in the left knee and ankle. He had atrophy in the left quadricep and a positive straight leg raise on the left with axial pain. Dr. Borden reported: "Minimal weight bearing on the left leg[,] he uses a walker or cane for ambulation[.]" Dr. Borden assessed that plaintiff "clearly has DDD (degenerative disc disease) at both L4-5 and L5-S1, which according to the discography by Dr. Jobalia are both symptomatic. Unclear if foot drop will recover given length of time, but L4-5, L5-S1 fusion is an option." (Tr. 1465). Dr. Borden reported that plaintiff understood the risks of surgery and wanted to proceed. The plan was to proceed with a right decompressive laminofacetectomy at L4-5 and L5-S1[4]; transforaminal interbody arthrodesis L4-5 and L5-S1 with Autograft; a Globus Rise interbody cage; microsurgical foraminotomy L4-5 and L5-S1; posterolateral arthrodesis L4-5 and L5-S1 with Autograft; and Globus Transition pedicle screw instrumentation. (Tr. 1465). Plaintiff was to return following surgery for one month of follow-up. (*Id.*).

On December 14, 2016, Dr. Borden wrote a letter to plaintiff's counsel opining that in addition to plaintiff's foot drop, which unquestionably had been caused by his work injury, "the additional diagnosis of 'post laminectomy syndrome' is a 'flow through' to the BWC diagnosis of L4-5 disc displacement." (Tr. 1747-48). Dr. Borden opined that at the time Dr. Ararnd performed the laminectomy/discectomy in 2014, plaintiff also had the L5-S1 disc displacement though "it was felt not to be symptomatic." (Tr. 1747). Dr. Borden opined that plaintiff had "been under a great deal of pain with a clear-cut nerve injury as a result of the work-related injury"; he had "seen multiple pain specialists without adequate relief"; and Dr. Borden had

---

[4] "Decompression:" is defined as "opening or removal of bone to relieve pressure and pinching of the spinal nerves." *See* https://mayfieldclinic.com/pe-sten.htm (last visited on Jan. 6, 2020).

"seen him for [Dr. Borden's] opinion regarding further surgery." (*Id*.). Dr. Borden reported that Dr. Jobalia had performed a discography at his request, which confirmed discogenic pain at L4-5 and L5-S1. Dr. Borden stated that given plaintiff's "lack of response to very extended non-surgical treatment and given these new diagnostic findings," he had recommended an L4-5, L5-S1 fusion. Dr. Borden concluded that "in the post-discectomy setting, after failure of extensive non-surgical treatment, surgical fusion should be considered," and he opined that the "L5-S1 disc displacement and subsequent [degenerative disc disease] is directly caused by the original work injury to within a reasonable degree of medical certainty." (Tr. 1748). Dr. Borden also opined that the foot drop indicated a permanent neurologic injury that could require further treatment, which might include spinal cord stimulation. (*Id*.).

Dr. Borden saw plaintiff on April 6, 2017, on follow-up to discuss surgery. (Tr. 1744-46). Plaintiff complained of continued lumber pain that radiated to the left lower extremity and foot drop following his 2014 work injury. (Tr. 1744). The findings on neurologic exam were unchanged from the prior visit. Plaintiff had reduced strength and sensation and diminished reflexes on the left, the left lower extremity was atrophied, and he was minimally weight bearing on the left, ambulating with a cane. (Tr. 1744-45). Lumbar CT test results disclosed annular tears and degenerative disc disease at L4-L5 and L5-SI. The BWC had allowed lumbosacral neuritis, displacement of lumbar intervertebral disc without myelopathy at L4-L5, and left foot drop. (Tr. 1745). Plaintiff understood his "left foot drop most likely reflects nerve injury and may not be relieved with surgery," and plaintiff confirmed his desire to proceed with an L4-5, L5-S1 fusion for the degenerative disc disease.

Plaintiff testified at the ALJ hearing held in July 2017 that a spinal fusion had been approved, stating "We're in a process as we speak now getting the date this week to have the spinal fusion." (Tr. 57).

### 1. Medical and chiropractor opinions

In December 2015, reviewing state agency physician Dr. Edmond Gardner, M.D., assessed limitations due to degenerative disc disease of the lumbo-sacral spine status-post December 2014 laminectomy. (Tr. 100). Dr. Gardner found that plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk for about 4 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; frequently balance; occasionally climb ramps/stairs, stoop, kneel, crawl, and crouch; and never climb ladders/ropes/scaffolds. (Tr. 99-100). Dr. Gardner also assessed restrictions against unprotected heights, dangerous machinery, and commercial driving. (Tr. 100).

On reconsideration in February 2016, Dr. Maria Congbalay, M.D., reviewed additional evidence generated in November 2015 and January 2016. A treatment note dated November 2015 reported that plaintiff appeared to be in distress, he was ambulating with a cane, he had significant difficulty with regard to any attempt at motion, he had an antalgic gait, he was unable to heel and toe walk on the left, and he had difficulty going from a seated to a standing position. His lumbar range of motion was limited to 10 degrees on flexion, 0 degrees on extension, and 5 degrees "SB." He had a positive Kemp's test bilaterally. Plaintiff had weakness and diminished sensation in the lower left extremity. A January 2016 MRI of the lumbar spine showed a recurrent or residual disc protrusion at L4-5 with effacement of the proximal L5 nerve root and L5-S1 disc protrusion; degenerative facet arthropathy at L4-S1 with mild lumbar foraminal stenosis at L4-5; and bilateral femoral head avascular necrosis. (Tr. 112). Dr. Congbalay

affirmed Dr. Gardner's assessment based on a finding of degenerative disease of the lumbar spine status-post laminectomy December 2014.  (Tr. 114-117).

Plaintiff's chiropractor, Dr. Murdock, completed a Medical Assessment of Ability to Do Work Related Activities (Physical) on November 9, 2016.  (Tr. 1560-65).  Dr. Murdock reported that he treated plaintiff for lumbar disc displacement and radiculopathy in the lumbar region. (Tr. 1560).  The medical findings that supported his assessment were "MRI, x-ray, EMG, [and] exam." (Tr. 1561).  He assessed plaintiff as able to lift not more than 10 pounds occasionally (no more than 2.5 hours) and 5 pounds frequently (2.5  to 5 hours) in a workday; walk/stand for 2 hours total and for 10 minutes without interruption; sit for 4 hours and for 10 minutes without interruption; never climb, stoop, kneel, balance, crouch, or crawl; never reach or push/pull; occasionally handle; and frequently feel.  (Tr. 1562-63).  Dr. Murdock also assessed environmental restrictions against heights, moving machinery, temperature extremes, humidity, and vibrations.  (Tr. 1563-64).  He opined plaintiff would be off task 75-100% of the workday. (Tr. 1564).  Dr. Murdock completed an assessment the following day opining that plaintiff met Listing 1.04 for a disorder of the spine.  (Tr. 1453).

Dr. William D. Ross, DO, a pain management specialist, managed plaintiff's chronic pain medication from April 2017 to June 2017.  (Tr. 1721-41).  He completed a Medical Assessment of Ability to do Work Related Activities (Physical) on May 20, 2017.  (Tr. 1553-59).  Dr. Ross listed plaintiff's diagnoses lumbar-sacral neuritis, degenerative disease of the lumbar spine, left foot drop, and "IUDD." (Tr. 1553).  He assessed plaintiff as able to lift 10 pounds occasionally and 1 pound frequently; stand/walk less than 1 hour in an 8-hour workday; and sit 2 to 3 hours during an 8-hour workday and for less than 1 hour without interruption.  (Tr. 1555-57).  Dr. Ross also assessed environmental restrictions.  (Tr. 1556).  Dr. Ross reported that standing and

walking were affected by plaintiff's impairments, and he noted that plaintiff had left foot drop and was using a cane. (Tr. 1554). The medical findings that supported the restrictions he assessed were the CT scan and MRI results, which disclosed L4-L5, L5-S1 left paracentral disc protrusion, foraminal protrusion on the left at L5-SI, nerve root abutment, and annular tears. (Tr. 1554). Clinical findings were left leg weakness and positive straight leg raise result on the left. (Tr. 1554-56). Dr. Ross opined that pain from plaintiff's conditions would cause plaintiff to be off-task and would be severe enough to interfere with attention and concentration needed to perform even simple work tasks 50% to 75% of the workday. (Tr. 1558). He found that plaintiff's impairments were likely to produce "good days" and "bad days" and would cause plaintiff to miss four or more days from work each month. (*Id.*).

Dr. Borden opined on July 10, 2017 that plaintiff met Listing 1.04 based on examination and CT scan/MRI results. (Tr. 1756). Dr. Borden opined that plaintiff suffers from "[a] disorder of the spine . . . that has resulted in the compromise of a nerve root . . . or the spinal cord *with* . . . A. Evidence of nerve root compression characterized by . . . neuro-anatomic distribution of pain, . . . motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss," and "atrophy (plus) Foot drop."

### E. Specific errors

Plaintiff's first three assignments of error relate to the ALJ's finding that plaintiff did not have nerve root compression. Plaintiff alleges as his first assignment of error that the ALJ erred by "playing" medical doctor and making an independent finding that plaintiff had "nerve root effacement" rather than "nerve root impingement or compression." (Doc. 6 at 3-7). Plaintiff alleges as his second assignment of error that the ALJ erred in finding he did not meet or equal Listing 1.04(A) for disorders of the spine, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04, for this

same reason. (Doc. 6 at 7-8). Plaintiff argues that in making this finding, the ALJ erroneously rejected the opinions of his treating neurosurgeon, Dr. Borden, and chiropractor, Dr. Murdock, that plaintiff met the Listing. (Doc. 6 at 8, citing Tr. 33, 35). Plaintiff contends that he had nerve root impingement or compression, and the ALJ's finding that he did not meet or equal Listing 1.04 is not supported by substantial evidence. Plaintiff argues that the ALJ ignored the "clear diagnostic tests, the operative report, and the medical opinions of every treating physician," each of whom opined he had nerve root displacement and impingement. (*Id*. at 8). Plaintiff alleges as his third assignment of error that the ALJ erred by declining to give Dr. Borden's opinion controlling weight because he was not a treating physician or, alternatively, because Dr. Borden concluded that plaintiff has nerve root compression. (*Id*. at 8-14).

The Commissioner argues that the ALJ reasonably determined based on the diagnostic evidence that there was no evidence of nerve root compression and that he did not meet Listing 1.04 at step three. (Doc. 10 at 4-7). The Commissioner contends that the ALJ did not err by discounting Dr. Borden and Dr. Murdock's opinions that plaintiff met Listing 1.04 because their opinions were "based on the belief" that plaintiff had "nerve root compression," and the "evidence of record shows that Plaintiff did not have nerve root compression or impingement after this 2014 back surgery." (Doc. 10 at 7-11, 9).

1. Step three analysis/Evaluating the evidence (First/second assignments of error)

The ALJ determines at step three of the sequential evaluation whether the claimant's disability meets a condition in the listing of impairments, 20 C.F.R. Pt. 404, Subpt. A, App. 1. The listing describes conditions that are "severe enough to prevent an individual from doing any gainful activity, regardless of his . . . age, education, or work experience." 20 C.F.R. § 404.1525(a) (effective March 27, 2017). Each listed impairment is described in terms of its

"signs, symptoms, and diagnostic indicators." *Joyce v. Commr. of Soc. Sec.*, 662 F. App'x 430, 433 (6th Cir. 2016) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)).

The claimant must present evidence establishing that his impairment meets or equals all the listing criteria in order to establish eligibility for benefits at step three. *Id.* (citing *Sullivan*, 493 U.S. at 530-31). *See also Jones v. Commr. of Soc. Sec.*, No. 1:16-cv-68, 2017 WL 5015526, at *3 (E.D. Tenn. Aug. 22, 2017). "Because satisfying the listings during the third step yields an automatic determination of disability based on medical findings, rather than a judgment based on all relevant factors for an individual claimant, the evidentiary standards for a presumptive disability under the listings are more strenuous than for claims that proceed through the entire five-step evaluation." *Jones,* 2017 WL 5015526, at *3 (quoting *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 539 (6th Cir. 2014) (citing 20 C.F.R. §§ 416.925(d), 416.926; *Sullivan*, 493 U.S. at 532).

> Listing 1.04(A) provides:
>
> 1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

(*Id.*).

Thus, to satisfy Listing 1.04(A), plaintiff must demonstrate: (1) neuro-anatomic distribution of pain; (2) limitation of motion of the spine; (3) motor loss (atrophy with associated muscle weakness or muscle weakness); (4) sensory or reflex loss; and (5) positive straight leg raise test, in both the sitting and supine positions. In addition, the regulations require that the

abnormal findings must be established over a period of time: "Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00D.

The ALJ's role is to evaluate the medical and other evidence of record and "make the ultimate decision as to whether that evidence 'proves or undermines'" the individual's claim of disability. *Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 722 (6th Cir. 2012); 20 C.F.R. 404.1527(c)-(d).[5] However, an ALJ "may not substitute h[er] own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence." *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Meece v. Barnhart,* 192 F. App'x 456, 465 (6th Cir. 2006)). "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Id.* (citing *Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir. 1996)). An ALJ's reliance on her own interpretation of the medical data is prohibited. *Bond v. Commr. of Soc. Sec.*, No. 3:18-cv-369, 2020 WL 467699, at *3 (S.D. Ohio Jan. 29, 2020) (citing *Simpson*, 344 F. App'x at 194) (citing *Rohan*, 98 F.3d at 970).

Plaintiff alleges that the ALJ erroneously rejected both Dr. Borden's medical opinion that plaintiff had evidence of nerve root compression and met Listing 1.04 and Dr. Murphy's concurring opinion that plaintiff met the Listing. (Doc. 6 at 8). Plaintiff contends that the ALJ relied on her own erroneous finding that "the objective MRI and imaging evidence of record [] does not show nerve root compression or impingement, and instead, shows effacement ([Tr. 1484-93, 464-506, 1439, 1441, 1453])." (Doc. 6 at 8, citing Tr. 33, 35). Plaintiff argues that the

---

[5] 20 C.F.R. § 404.1527 has been amended for claims filed on or after March 27, 2017. 82 FR 15132-01, 2017 WL 1105368. The amendments do not apply to plaintiff's claim, which he filed in 2015.

"diagnostic testing and operative report provide conclusive evidence he had nerve root impingement, displacement, and compression." (Doc. 6 at 5-6, citing Tr. 523, 448-49- 2014 MRI report; TR. 448- Dr. Arand's 12/8/2014 operative report; Tr. 515-16- Dr. Wanat's 5/2014 report; Tr. 509-12- Dr. Tammy Musolino's 5/2014 report; Tr. 795-96- Dr. Jobalia's 10/2015 report of initial post-injury MRI results; Tr. 1466, 1747, 1748- Dr. Borden's findings of permanent nerve injury). The Commissioner contends that the record evidence supports that ALJ's finding that the medical evidence shows only effacement and not nerve root compression. (Doc. 10 at 5, citing Tr. 396- January 2015 MRI; Tr. 341, 467, 1578- June 2015 electromyography results; Tr. 1439- January 2016 lumbar MRI results; Tr. 1472-73- July 2016 lumbar CT scan). The Commissioner also contends that the ALJ's step three finding is supported by physical examination findings which were mostly normal, except for slightly decreased left foot strength at times, and which show he had a normal gait without the use of an assistive device. (*Id*. at 5-6).

The ALJ's finding that plaintiff's back impairment did not meet or medically equal Listing 1.04 is not substantially supported. (Tr. 27). The ALJ found:

> Listing 1.04 (Disorders of the spine) is not met or medically equaled because the claimant's back impairment does not result in a compromise of a nerve root *with* nerve root compression ([Tr. 350, 396, 1439]). While the claimant had evidence of nerve root *effacement*, he does not have nerve root compression (emphasis added) ([Tr. 1484-93, Tr. 464-506, Tr. 1439, Tr. 1441]).

(Tr. 27). As evidence that plaintiff "does not have nerve root compression," the ALJ cited a June 2014 MRI report (Tr. 1441); a hospital record showing that plaintiff underwent a left L4-5 hemilamenectomy and diskectomy in December 2014 for back and leg pain which had failed to respond to conservative treatment (Tr. 350); a January 2015 lumbar MRI report that showed post-surgical changes at L4-L5 but no recurrent disc herniation (Tr. 396); pain management

physician Dr. John Beresh, M.D.'s records dated March to October 2015 (Tr. 464-506); and a January 2016 MRI report (Tr. 1439). The only records the ALJ cited for the period after January 2016 were the treatment notes of pain management physician Dr. Atul Chandoke, M.D., who saw plaintiff January 26, 2017, after he failed a pill count and was discharged from treatment with Dr. Jobalia. (Tr. 1484-1493). Dr Chandoke did not report any abnormal physical examination findings in his treatment notes, but it is not clear whether Dr. Chandoke performed any testing. Despite the lack of any abnormal findings, Dr. Chandoke reported that there was "no evidence of any long term improvement in pain in function," plaintiff was "a complex patient to handle" from a pain management perspective, and the plan was to gradually wean plaintiff off opioids which he had been prescribed and to consider surgery with Dr. Borden. (Tr. 1492). The ALJ did not consider at step three subsequent treatment notes and reports that addressed plaintiff's referral to Dr. Borden for an opinion on a second spinal surgery and the medical findings that led to the BWC's approval of plaintiff's request for that surgery.

Nor did the ALJ address at step three Dr. Borden's opinion that based on the MRI, CT, and examination findings, plaintiff suffered from "[a] disorder of the spine . . . that has resulted in the compromise of a nerve root . . . or the spinal cord *with* . . . A. Evidence of nerve root compression characterized by . . . neuro-anatomic distribution of pain, . . . motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss, and "atrophy (plus) Foot drop." (*See* Tr. 1756). The ALJ rejected Dr. Borden's opinion at *step four* of the sequential evaluation because she found the "the objective imaging contradicts" the "premise" of his opinion, which is that plaintiff "has nerve root compression"[6] (Tr. 33). But this

---

[6] As discussed more fully *infra*, the ALJ's reasons for rejecting Dr. Borden's opinion when assessing plaintiff's RFC at step four of the sequential evaluation are not substantially supported by the record.

is a medical judgment the ALJ was not qualified to make. The ALJ substituted her "own medical judgment" that the imaging results conclusively established there was no nerve root compression for the medical judgment of plaintiff's treating neurosurgeon, who found there was *evidence* of nerve root compression in the form of the imaging results, the clinical signs, *and* plaintiff's symptoms. *See Simpson,* 344 F. App'x at 194; *Bond,* 2020 WL 467699, at *3. The ALJ was not qualified to reject Dr. Borden's opinion concerning plaintiff's medical condition based solely on imaging results that she believed contradicted medical findings he made based on several sources of information.

Similarly, the ALJ rejected the opinion of Dr. Murdock, plaintiff's chiropractor, who found evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss, and positive straight-leg raising test. (Tr. 35, citing Tr. 1453). The ALJ rejected his opinion because she found his "belief" that there was evidence of nerve root compression to be "false" as there was only evidence of "effacement." (Tr. 35). The ALJ was not bound to give Dr. Murdock's opinion any special deference,[7] but she nonetheless erred by rejecting his opinion that there was "evidence of nerve root compression" as a "false belief." (Tr. 35). Dr. Murdock's assessment that there was evidence of nerve root compression is consistent with Dr. Borden's medical opinion and is supported by medical findings made by Dr. Borden, Dr. Murdock, and other providers. The ALJ's contrary finding

---

[7] Under former 20 C.F.R. § 404.1513(d)(1) (2013): "chiropractors [] are considered to be 'other sources' rather than 'acceptable medical sources.'" Although the ALJ could consider Dr. Murdock's opinion on the severity of plaintiff's back impairment and how it affected his ability to work, the ALJ was not required to give any special deference to Dr. Murdock's assessments. *Id.*; 20 C.F.R. § 404.1527(f); *Wooley v. Comm'r of Soc. Sec.*, No. 1:11-CV-802, 2013 WL 204677 (S.D. Ohio Jan. 17, 2013) (Report and Recommendation), *adopted*, No. 1:11-CV-0802, 2013 WL 645857, *6 n.4 (S.D. Ohio Feb. 21, 2013). Section 404.1513 was amended effective March 27, 2017, but the prior version applies to plaintiff's application filed in 2015. 20 C.F.R. § 404.1513.

that there was no *evidence* of nerve root compression based solely on the imaging results is a medical judgment the ALJ was not qualified to make.

In short, the ALJ did not properly consider at step three whether the record demonstrated "compromise of a nerve root (including the cauda equina) or the spinal cord" with "(A) Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, or motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and positive straight-leg raising." The ALJ based her step three finding that plaintiff's back impairment did not meet or equal Listing 1.04 on her determination that plaintiff had evidence only of nerve root "effacement" and "does not have nerve root compression." (Tr. 27). The ALJ erroneously failed to consider evidence of nerve root compression, including evidence provided by plaintiff's treating neurosurgeon, when determining whether plaintiff's back impairment met or equaled Listing 1.04. Her finding that plaintiff's back impairment does not meet or equal Listing 1.04 is not supported by substantial evidence.

Plaintiff's first and second assignments of error should be sustained.

## 2. Weight to the treating physician's opinion (Third assignment of error)

Plaintiff alleges as his third assignment of error that the ALJ erred by finding that Dr. Borden was not a treating physician and by declining to give his opinion "controlling" weight. (Doc. 6 at 8-14). The Commissioner concedes that the ALJ did not consider Dr. Borden to be a treating physician. (Doc. 10 at 8). Nonetheless, the Commissioner does not seek to defend the ALJ's conclusion. Rather, the Commissioner contends that whether Dr. Borden is properly characterized as a treating physician is inconsequential. The Commissioner argues that "the ALJ treated Dr. Borden as a treating physician" and declined to give his opinion controlling weight

because it was inconsistent with substantial evidence of record. The Commissioner argues that the ALJ instead reasonably gave Dr. Borden's opinion "little" weight. (*Id*. at 8-9).

The ALJ found that Dr. Borden was not a "treating physician" based on three factors. (*Id*.). First, the ALJ found that as of July 10, 2017, the date Dr. Borden issued his opinion, Dr. Borden saw plaintiff "infrequently." (Tr. 33, citing Tr. 1463, 1467, 1744). Second, the ALJ found that Dr. Borden's "services were requested for the purposes of [plaintiff's] disability claim." (Tr. 33). Third, the ALJ determined that while Dr. Borden was supposed to perform a second lumbar fusion at some point, "the record does not contain any 2017 surgical notes." (*Id*., citing Tr. 1740) (April 2017 treatment note which states that plaintiff "has been BWC approval (sic) for surgery fusion of L4-5 through S1 for Dr Borden[,] surgery date is pending."). The ALJ further found that even if Dr. Borden was a treating physician, his opinion was not entitled to "controlling" weight but instead was entitled to only "little" weight. (Tr. 33).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. Under the treating physician rule, "greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. . . ." *Rogers*, 486 F.3d at 242; *Wilson*, 378 F.3d at 544. The rationale for the rule is that treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone." *Rogers*, 486 F.3d at 242. Generally, a treating physician's opinion deserves controlling weight because "a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but

once, or who has only seen the claimant's medical records." *Barker v. Shalala,* 40 F.3d 789, 794 (6th Cir. 1994); *see also Coldiron v. Commr. of Soc. Sec.*, 391 F. App'x 435, 442 (6th Cir. 2010).

A treating source's medical opinion must be given controlling weight if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in [the] case record[.]" 20 C.F.R. § 404.1527(c)(2); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). If a treating source's medical opinion is not entitled to controlling weight, the ALJ must apply the following factors in determining what weight to give the opinion: the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source. *Wilson*, 378 F.3d at 544. *See also Blakley*, 581 F.3d at 408 ("Treating source medical opinions [that are not accorded controlling weight] are still entitled to deference and must be weighed using all of the factors provided in" 20 C.F.R. § 404.1527(c) (quoting Soc. Sec. Rul. 96-2p[8], 1996 WL 374188, at *4). In addition, an ALJ must "give good reasons in [the] notice of determination or decision for the weight [given to the claimant's] treating source's medical opinion." 20 C.F.R. § 404.1527(c)(2). The ALJ's reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (citing Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5). This requirement serves a two-fold purpose: (1) it helps a

---

[8] Effective March 27, 2017, SSR 96-2p was rescinded when the Social Security Administration published final rules that revised the rules and regulations applicable to the evaluation of medical evidence for claims filed on or after that date. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819, at *5844-45, 5869, 5880. *Shields v. Comm'r of Soc. Sec.*, 735 F. App'x 430, 437 n.9 (6th Cir. 2018). Since plaintiff's claim was filed prior to March 27, 2017, SSR 96-2p applies to this case.

claimant to understand the disposition of his case, especially "where a claimant knows that his physician has deemed him disabled," and (2) it "permits meaningful review of the ALJ's application of the [treating-source] rule." *Wilson*, 378 F.3d at 544. "A failure to follow the procedural requirement 'of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (quoting *Rogers*, 486 F.3d at 243).

Opinions from non-treating and non-examining sources are never assessed for "controlling weight." A non-treating source's opinion is weighed based on the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(3)-(6). Because a non-examining source has no examining or treating relationship with the claimant, the weight to be afforded the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for his opinions and the degree to which his opinion considers all of the pertinent evidence in the record, including the medical opinions of treating and other examining sources. 20 C.F.R. § 404.1527(c)(3).

The ALJ's decision to discount Dr. Borden's opinion is not substantially supported. The ALJ was required to evaluate Dr. Borden's opinion under the treating physician rule. As of the date he issued his July 10, 2017 opinion, Dr. Borden had seen plaintiff three times over a 12-month period - February 2016, August 2016, and April 2017 - for the purposes of treating plaintiff and evaluating him for surgery, which the BWC eventually approved. (Tr. 1463, 1467, 1744). The ALJ discounted Dr. Borden's status because the ALJ found someone had requested

his "services . . . for the purposes of [plaintiff's] disability claim." (*Id.*). But this is not accurate.
The treatment notes show that Dr. Borden saw plaintiff on referral from Dr. Murdock, plaintiff's
chiropractor, for assessment and treatment of radiating back and neck pain. (Tr. 1467-71).
Further, the ALJ acknowledged that Dr. Borden was supposed to perform a second lumbar fusion
at some point. (Tr. 33). Dr. Borden's April 2017 treatment note states that plaintiff "has been
BWC approval (sic) for surgery fusion of L4-5 through S1 for Dr. Borden[,] surgery date is
pending." (Tr. 1740). Plaintiff testified at the ALJ hearing that the surgery was in the process of
being scheduled as of that date. (Tr. 57). The fact that Dr. Borden had seen plaintiff several
times and was scheduled to perform surgery on him supports, rather than detracts from, a finding
that Dr. Borden had established a treatment relationship with plaintiff. The ALJ did not explain
why the final consideration - the absence of "any 2017 surgical notes" from the record - showed
that Dr. Borden was not a treating physician. (Tr. 33, citing Tr. 1740). The ALJ erred by finding
Dr. Borden was not a treating physician. The error was not harmless for reasons discussed *infra*
in connection with the "good reasons" requirement.

The ALJ found that although Dr. Borden was "not a treating physician," even if he were
his opinion was not entitled to "controlling" weight and was entitled to only "little" weight. (Tr.
33). The ALJ did not comply with the requirements of the treating physician rule in evaluating
Dr. Borden's opinion, and her decision to give less than "controlling" weight to Dr. Borden's
opinion is not supported by substantial evidence.

First, the ALJ did not apply the two-prong "controlling" weight analysis as required by
the regulations. 42 U.S.C. § 404.1527(c)(2); *Gayheart*, 710 F.3d at 376. The ALJ did not
properly consider whether Dr. Borden's opinion was "well-supported by medically acceptable
clinical and laboratory diagnostic techniques." *Id*. The ALJ found that "Dr. Borden's opinion

cannot be afforded deference because the premise of Dr. Borden's conclusion is that the claimant has nerve root compression, however, the objective imaging contradicts that finding." (Tr. 33). The ALJ further found that other abnormal findings were lacking. She determined that "while [plaintiff] had foot drop, he still maintained normal gait" and that "Dr. Borden indicated [plaintiff] has normal range of motion in the spine." (*Id*.). But in making her findings, the ALJ failed to consider Dr. Borden's examination findings and his interpretation of the objective imaging evidence which led him to conclude there was "[e]vidence of nerve root compression," specifically, "neuro-anatomic distribution of pain"; "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss"; and "atrophy [plus] Foot drop." (Tr. 1756).

On examination, Dr. Borden consistently found reduced or absent motor strength in the lower extremities; atrophy in the left quadricep; positive straight leg raise test with axial pain; reduced sensation in the left leg; diminished reflexes in the left knee and ankle; minimal weight bearing on the left leg such that plaintiff used a walker or cane for ambulation, and significant foot drop following work related "HNP" and subsequent surgery for which Dr. Borden recommended an AFO brace to help prevent falls. (Tr. 1463-65,1466, 1469, 1470, 1744-45). In February 2016, Dr. Borden opined that plaintiff's foot drop indicated a permanent nerve injury which was directly related to "previous compression on the L5 nerve root by the L4/5 disc displacement," and he requested approval for testing and an AFO brace for permanent foot drop. (Tr. 1466, 1470). Dr. Borden opined in August 2016 that plaintiff "clearly has DDD (degenerative disc disease) at both L4-5 and L5-S1 which according to the discography by Dr. Jobalia are both symptomatic." (Tr. 1465). The findings on neurologic exam were unchanged over time. In April 2017, the plan was to perform a "left decompressive laminofacetectomy L4-

L5 and L5-S1." (Tr. 1744-46). Dr. Borden opined that plaintiff's foot drop reflected permanent nerve injury, and he questioned whether surgery would be successful. (Tr. 1745). These treatment notes and examination findings appear to support Dr. Borden's opinion that plaintiff had nerve root compromise with evidence of nerve root compression. The ALJ erred by failing to evaluate whether Dr. Borden's opinion was well-supported by these treatment notes and clinical findings.

Second, the treating physician rule requires the ALJ to evaluate whether the treating provider's opinion "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). The ALJ found that Dr. Borden's opinion was inconsistent with "substantial evidence of record, including objective physical examination findings and other physical opinion evidence." (Tr. 33). First, the ALJ found that the "objective MRI and imaging evidence of record, does not show nerve root compression or impingement and instead, shows effacement." (Tr. 33, citing Tr. 1484-93- Dr. Chandoke's 1/16/2017 treatment notes; Tr. 464-506, Dr. Beresh's 3/27/15-10/5/15 treatment notes; Tr. 1441, 6/2014 MRI; Tr. 1439, 1/14/2016 MRI). Second, the ALJ found that while plaintiff "did have muscle atrophy in his left quadriceps at one point, [], subsequent examination showed [he] regained his muscle tone and bulk." (*See* Tr. 1489- Dr. Chandoke treatment note; Tr. 1721, 1723- Dr. Ross treatment notes). Third, the ALJ found that in 2017, plaintiff "had [a] normal musculoskeletal examination ([Tr. 1489]" with Dr. Chandoke. (Tr. 33).

The ALJ did not cite substantial evidence that was inconsistent with Dr. Borden's assessment of nerve root compromise with evidence of nerve root compression. The ALJ cited Dr. Beresh's treatment notes from March until October 2015, but that treatment occurred nearly two years before Dr. Borden issued his assessment and before plaintiff was approved by the

BWC for surgery. (Tr. 464-506). Dr. Chandoke's note does not reflect any abnormal physical examination findings, but Dr. Chandoke concluded "[t]here is no evidence of any long term improvement in pain or function" and that the plan was to consider surgery with Dr. Borden. (Tr. 1491). Dr. Chandoke's conclusion appears to be consistent with Dr. Borden's opinion and the BWC's eventual approval of the request for a second surgery. In addition, the ALJ cited January and June 2017 treatment notes to show that plaintiff "regained muscle tone and bulk" in a previously atrophied left quadricep. (Tr. 33, citing Tr. 1489, 1721, 1723). But those notes do not reflect an improvement in plaintiff's condition from January to June 2017. Treating pain physician Dr. Ross reported in June 2017 that plaintiff had foot drop and "weakness of the left leg," he was "[u]sing a walker for ambulation," the goal of the chiropractor was to help him walk without tripping or falling, and he had experienced three falls, one of which led to a hospitalization, in the past year. (Tr. 1721-24). His examination findings included left drop weakness and deficits and a positive straight leg test; limited range of motion and pain with motion; and decreased deep tendon reflexes (2/4) of the patella/Achilles. Dr. Ross noted that plaintiff had BWC approval for surgery for fusion of L4-5 through S1, a hearing was upcoming, and surgery was pending. (Tr. 1721-24). Thus, contrary to the ALJ's finding, much of the evidence the ALJ relied on appears to be consistent with Dr. Borden's opinion. *See Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)).

In addition, the ALJ found Dr. Borden's opinion was not entitled to controlling weight because it was inconsistent with the "other physician opinion evidence." (Tr. 33, citing Tr. 1560-66, 91-105, 107-122). The opinion evidence the ALJ generally cites to support this finding is the assessments of Dr. Murdock, plaintiff's chiropractor (Tr. 1560-65), and the non-examining state agency physicians (Tr. 91-105, 107-122). The ALJ did not explain in what respects the

assessments were inconsistent and why she discounted Dr. Borden's opinion based on these assessments. This was error. Dr. Borden's assessment appears to be consistent with the medical assessment completed by Dr. Murdock on November 9, 2016. (Tr. 1560-65). Dr. Murdock reported that he treated plaintiff for lumbar disc displacement and radiculopathy in the lumbar region. (Tr. 1560). The medical findings that supported his assessment were "MRI, x-ray, EMG, [and] exam." (Tr. 1561). He limited plaintiff to lifting not more than 10 pounds occasionally and 5 pounds frequently; walking no more 2 hours and 10 minutes without interruption; and sitting for 4 hours and for 10 minutes without interruption. (Tr. 1562). Further, Dr. Murdock opined in November 2016 that plaintiff met Listing 1.04. (Tr. 1452-1454). Dr. Murdock's opinion thus appears to be consistent with Dr. Borden's opinion in material respects.

Further, the ALJ erroneously relied on the December 2015 and February 2016 opinions of the nonexamining state agency physicians to discount the opinion of plaintiff's treating neurosurgeon. The ALJ gave the state agency physicians' assessments limiting plaintiff to four hours of standing/walking "great weight" because she found their opinions were "most consistent with the overall objective evidence, including with more recent examinations." (Tr. 33, citing Tr. 1484-93). The only evidence the ALJ found to be consistent with these assessments was the January 2017 treatment note of Dr. Chandoke. (Tr. 1484-93). The ALJ did not address the significance of Dr. Chandoke's report that there had been no improvement in plaintiff's condition or functioning and surgery with Dr. Borden was under consideration, or the apparent inconsistency between Dr. Chandoke's examination findings and the standing/walking limitations assessed by the non-examining physicians. The ALJ's "more rigorous scrutiny of the treating-source [Dr. Borden's] opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires." *Gayheart*, 710 F..3d at 379

(citing 20 C.F.R. § 404.1527(c); Soc. Sec. Rul. No. 96-6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)).

Even assuming, *arguendo*, that the ALJ's decision to afford less than controlling weight to Dr. Borden's opinion is substantially supported, the ALJ's decision falls far short of the Agency's own procedural requirements. A finding that a treating source medical opinion is not entitled to "controlling weight" does not mean that the opinion should be rejected. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4. "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527. . . ." *Id.*; *Blakley*, 581 F.3d at 408. The ALJ did not properly consider the regulatory factors in deciding the weight to afford Dr. Borden's opinion. As discussed *supra*, the ALJ erroneously characterized the nature of the treatment relationship by finding that plaintiff had consulted Dr. Borden to establish his disability claim, when in fact plaintiff was referred to Dr. Borden for treatment and evaluation for surgery. (Tr. 33). Further, the ALJ discounted the treatment relationship because surgery notes were not in the record, even though the record showed that the BWC had approved surgery by Dr. Borden and the surgery was in the process of being scheduled at the time of the ALJ hearing. (*Id.*, Tr. 57). Further, the ALJ did not give reasons that are substantially supported by the record for discounting Dr. Borden's opinion that there is evidence of nerve root compression. (Tr. 33).

Thus, the ALJ erred by finding that Dr. Borden was not a treating physician and, assuming he was, his opinion that plaintiff met or equaled Listing 1.04 was not entitled to "controlling" weight and was instead entitled to only "little" weight. The ALJ did not provide reasons that are substantially supported by the record for finding that the ALJ's decision was (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2)

"not inconsistent with the other substantial evidence in [the] case record[.]" *See* 20 C.F.R. § 404.1527(c)(2). The ALJ also did not provide "good reasons" that are substantially supported by the evidence of record for giving Dr. Borden's opinion "little" weight.

Plaintiff's third assignment of error should be sustained.

### 4. Weight to the treating psychologist (Fourth assignment of error)

Plaintiff alleges as his fourth assignment of error that the ALJ erred by failing to credit the opinions of his treating psychologist, Dr. Tricia Giessler, Psy.D. Plaintiff presented to Dr. Giessler on March 23, 2015 for an initial evaluation to address concerns of depression and anxiety. (Tr. 947-51). He reported no history of depression or anxiety prior to his work-related injury. He reported significant pain and limited physical functioning since his industrial injury on August 2014 and his inability to work since that time. He reported that he had a depressed mood daily and felt useless, often irritable, discouraged as he could not do much for himself, and often worried and distressed. He had a lower tolerance for stress and frustration, he experienced anxiety and panic attacks a few times daily, he was often on edge, and he had suicidal ideation without plan or intent. Dr. Giessler assessed plaintiff with major depressive disorder and anxiety disorder and felt he would benefit from psychotherapy and psychotropic medication. (Tr. 633-34, 947-51). Plaintiff continued to treat with Dr. Giessler through the date of the ALJ hearing. (Tr. 630-53, 1510-52).

On April 7, 2016, Dr. Giessler completed a Mental Status Questionnaire. (Tr. 1423-28). She reported that plaintiff's mood and affect were depressed, agitated, and anxious. He frequently worried and his sleep was impaired due to stress and pain. She reported that his concentration and memory were impaired due to depression, stress, and pain. She opined that his insight/judgment was fair and he was easily agitated. She diagnosed him with Major Depressive

Disorder and Anxiety Disorder NOS.  She reported that his response to treatment - individual psychotherapy every two weeks and psychotropic medication - and his prognosis were fair.  She opined he had some limitations in his ability to remember, understand, and follow directions due to pain, depression, and stress; his ability to maintain attention was impaired due to depression and stress; and his ability to sustain concentration, persist at tasks, and complete them in a timely fashion was impaired due to depression, stress, and anxiety.  Dr. Giessler reported that plaintiff was easily agitated in social situations and that his adaptation was poor due to depression and low stress tolerance.  She opined that in a work setting or elsewhere, plaintiff would react to pressures involved in simple and routine or repetitive tasks with very low stress and frustration tolerance and he would be easily overwhelmed and easily agitated.  Dr. Giessler opined that plaintiff's ability to perform daily activities was limited due to either pain or pain and depression, and his hobbies were very limited due to pain and depression.  (*Id.*).

On September 23, 2016, Dr. Giessler completed a summary on behalf of the Ohio BWC. (Tr. 1520).  She reported she had seen plaintiff twice a month for six months.  She reported that plaintiff was making some gains with decreased suicidal ideation and improved self-care, but he continued to struggle with significant depressed mood, particularly due to delays in getting medical treatment and waiting for surgery to be approved.  She opined that plaintiff was unable to work and continued to need twice-monthly sessions to decrease his depressed mood, lower agitation, and boost his ability to cope with pain.  (Tr. 1520).

On December 6, 2016, Dr. Giessler completed a Medical Assessment of Ability to Do Work Related Activities (Mental).  (Tr. 1457-61).  She opined that plaintiff had no useful ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, and maintain attention and concentration.  He had fair ability to follow work rules and a poor

ability to use judgment or function independently and follow work rules. Plaintiff was "easily

distracted by depression, pain, [and] stress" and he "could not tolerate stress at work. He [was]

easily agitated and could not tolerate interaction [with] coworkers, [the] public or supervisors."

(Tr. 1458). Plaintiff had no useful ability to understand remember and carry out even simple job

instructions as he was "too easily distracted by pain, stress [and] depression to focus on work

tasks." (Tr. 1459). Plaintiff's ability to maintain his personal appearance was fair and he had no

useful ability to behave in an emotionally stable manner, relate predictably in social situations,

and demonstrate reliability. He could not be "emotionally stable" and could not "be reliable due

to depression [and] being easily agitated [and] overwhelmed." (*Id.*). Plaintiff would need

frequent breaks for rest and relaxation. He was easily agitated, dwelled on negative thoughts,

was withdrawn from others, and had low motivation for persisting with work tasks due to

depression. (Tr. 1460). Dr. Geissler estimated his psychological impairments were severe

enough to interfere with attention and concentration needed to perform even simple work tasks

75%-100% of the workday. She concluded that his impairments were likely to produce "good

days" and "bad days" and that plaintiff would likely be absent from work four or more days per

month. (Tr. 1461).

On June 8, 2017, Dr. Giessler completed another Medical Assessment of Abilities to do

Work Related Activities (Mental) which was consistent with her December 2016 assessment.

(Tr. 1566-70).

The ALJ declined to give Dr. Giessler's opinions "controlling" weight and gave them

"little" weight. (Tr. 34). The ALJ discounted Dr. Giessler's opinions for the following reasons:

(1) Dr. Giessler, who is a psychologist and did not perform physical examinations, submitted

"medical opinions" (Tr. 1423-28, 1455-61, 1566-70); (2) Dr. Giessler indicated plaintiff started

seeing her so that she would complete his disability paperwork which Dr. Beresh, his treating pain management physician, was too busy to complete (Tr. 1353); (3) her opinions were inconsistent with substantial evidence of record, including mental status examinations and other physician opinion evidence (Tr. 91-105, 107-22); (4) the limitations she assessed were extreme in light of the "objective examination findings and overall objective evidence of record, including mental status examinations"; (5) the objective mental status examinations and psychiatric record consistently showed that plaintiff has normal or "unimpaired" ability to concentrate despite his subjective reports to the contrary; (6) other notes specifically indicated that plaintiff had "'all normal' attention span, concentration, and cognitive function"; (7) Dr. Giessler's opinion that plaintiff could not tolerate stress at work could only be based on plaintiff's subjective reports because she did not see plaintiff until after he stopped working because of his back condition, and he had no reported history of mental health issues until after he stopped working (Tr. 1458); (8) Dr. Giessler opined that plaintiff had no ability to remember complex instructions but never indicated whether he could understand and remember simple instructions (Tr. 1459, 1566-70); (9) Dr. Giessler found plaintiff could still manage his own finances despite his extreme mental health limitations, even though plaintiff alleged he could not (Tr. 240-48, 1460, 1569); and (10) Dr. Giessler administered the MMPI on "two separate occasions" (Tr. 1291) and though the first time the profile was invalid and the second time it was of "questionable validity" due to various scale elevations, she did not note the test results should be interpreted with caution and may not be reliable "[d]espite this level of exaggeration of symptoms," and it is not clear "[t]o what extent she merely channeled these invalid findings into her conclusions." (Tr. 34-35).

The ALJ committed several errors in evaluating Dr. Giessler's mental health assessments, and her decision to afford Dr. Giessler's opinions "little" weight is not substantially supported. First, the Commissioner concedes that the ALJ erred by finding that Dr. Giessler started seeing plaintiff so she could complete his disability paperwork. (Doc. 10 at 11). The record the ALJ attributes to Dr. Giessler in support of this finding was authored by Dr. Murdock. (*Id*., citing Tr. 1353).

The Commissioner nonetheless argues that this error was inconsequential because the ALJ correctly found that Dr. Giessler's opinions were inconsistent with the substantial evidence of record, including mental status examinations and other physician opinion evidence. The record does not substantially support the ALJ's findings. The ALJ found that the limitations Dr. Giessler assessed were extreme in light of objective findings which showed that plaintiff had "normal memory, [and] his memory functions are 'grossly intact' or 'good' for immediate, recent, and remote memory." (Tr. 34). The ALJ cited numerous medical records to support her findings, but many of the records are duplicative and the objective findings are actually found in only three treatment notes generated by plaintiff's treating physicians and one BWC evaluation report. (Tr. 1469 - 2/19/16 Dr. Borden treatment note; Tr. 684/452, 1/19/15 Dr. Arand treatment note; Tr. 702/713, 11/13/15 BWC evaluation; Tr. 1070/936/691/554, 10/28/14 Dr. Arand treatment note; *see also* Tr. 548, 10/19/14 Mayfield Clinic patient questionnaire). Similarly, the ALJ cites only one record - the BWC evaluation dated November 13, 2015 - to support her finding that the objective mental status examinations and psychiatric record "consistently" show that plaintiff has normal or "unimpaired" ability to concentrate despite his subjective reports to the contrary. (Tr. 34, citing Tr. 702/713). The ALJ likewise cited six exhibits that specifically indicated that plaintiff has "'all normal' attention span, concentration, and cognitive function,"

but the exhibits are actually duplicates of two of Dr. Arand's treatment notes dated October 28, 2014 (Tr. 1070/936/554/691) and January 19, 2015 (Tr. 684/452/591), which actually pre-date plaintiff's treatment with Dr. Giessler. The ALJ thus misconstrued the scope of the normal mental status findings made by plaintiff's treating physicians and erroneously concluded that the objective evidence showed that plaintiff consistently displayed unimpaired mental functioning.

Further, the ALJ erroneously rejected the findings of plaintiff's treating psychologist because Dr. Giessler did not have first-hand knowledge of certain symptoms, such as plaintiff's inability to tolerate stress at work. The Sixth Circuit "has acknowledged the difficulty inherent in proving psychological disabilities" and has explained:

> [A] psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as a medical impairment. . . . In general, mental disorders cannot be ascertained and verified as are most physical illnesses. . . . [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (quoting *Poulin v. Bowen*, 817 F.2d 865, 873-74 (D.C. Cir.1987) (quoting *Lebus v. Harris,* 526 F. Supp. 56, 60 (N.D. Cal. 1981)). Plaintiff's ability to tolerate stress at work was not amenable to substantiation by observation of plaintiff in a work setting. The ALJ's articulated reason for rejecting Dr. Giessler's opinion is insufficient and not supported by the evidence in the record.

In addition, the ALJ misrepresented the record by finding that Dr. Giessler never indicated whether plaintiff could understand and remember simple instructions. (Tr. 34, citing 1459, 1566-70). This is not accurate. Dr. Giessler opined in both reports the ALJ cites that plaintiff had no ability to understand, remember, and carry out simple job instructions. (Tr. 1459, 1568).

Finally, the ALJ misconstrued the record related to the MMPI results. The ALJ found that the test results showed an "exaggeration of symptoms" that led to "invalid findings" which Dr. Giessler may have "channeled . . . into her conclusions." (Tr. 34-35, citing Tr. 1291). But the evidence does not support a finding that plaintiff exaggerated his symptoms. (Tr. 1291). To the contrary, Dr. Geissler opined:

> His profile is of questionable validity due to elevations on the F and FB scale. He also has an elevation on the FBS scale. However, this scale is more effective at detecting patients who are over-reporting difficulties when they do not actually have significant physical problems. *In the patient's case, he does have ongoing pain and physical problems and is likely reporting true and valid concerns. His profile is reflective of a patient who is reporting significant distress.* His clinical scales profile indicates he is reporting difficulties with depressive and anxiety symptoms and likely meets criteria for a mood disorder. In addition, his profile suggests he is impulsive and shows poor judgment at times. His profile indicates he is reporting significant physical concerns, which is consistent with his pain and injuries. His profile indicates his thoughts may become confused and disorganized at times, particularly under increased stress.

(*Id.*) (emphasis added). The ALJ did not reasonably rely on the MMPI results to discount Dr. Giessler's opinions. Nor did the ALJ give any other valid reasons that are substantially supported by the record to discount Dr. Giessler's opinions. The ALJ misrepresented the record and made several errors in evaluating Dr. Giessler's opinions.

The ALJ instead gave "substantial weight" to the assessments of the state agency psychologists. (Tr. 32). Courtney Zeune, Ph.D., reviewed the medical record in December 2015 and concluded that plaintiff had moderate restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. 97). State agency psychologist Carl Tishler, Ph.D., affirmed Dr. Zeune's assessment upon reconsideration in February 2016. (Tr. 113-14). The ALJ credited their assessments for the sole reason that state agency "medical and psychological consultants are highly qualified physicians and psychologists

who are experts in the evaluation of the medical issues in disability claims under the Act (SSR 17-2p)." (Tr. 32). This is an accurate statement, but it does not explain why the ALJ credited these psychologists' assessments over the opinions of plaintiff's treating psychologist, who had treated plaintiff for over two years. The ALJ's "more rigorous scrutiny of the treating-source [Dr. Giessler's] opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires." *Gayheart*, 710 F.3d at 379 (citing 20 C.F.R. § 404.1527(c); Soc. Sec. Rul. No. 96-6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)). The ALJ's decision to credit the opinions of the state agency reviewing psychologists is not substantially supported.

Plaintiff's fourth assignment of error should be sustained.

## III. This matter should be reversed and remanded for an award of benefits

This matter should be remanded for an award of benefits. "[A]ll essential factual issues have been resolved and the record adequately establishes . . . plaintiff's entitlement to benefits." *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Sec'y of H.H.S.*, 820 F.2d 777, 782 (6th Cir. 1987). As discussed above, the evidence of disability is strong and opposing evidence is lacking in substance. The evidence of record strongly supports a finding that plaintiff meets Listing 1.04. In addition, the vocational expert testified that based on Dr. Giessler's assessment of plaintiff's ability to perform work-related activities from a mental standpoint, there are no jobs plaintiff could perform on a sustained basis. (Tr. 81-82, 84). A remand in this matter would merely involve the presentation of cumulative evidence and would serve no useful purpose. *Faucher*, 17 F.3d at 176. Because the record adequately establishes plaintiff's entitlement to benefits and there is no significant evidence to the contrary, this matter should be remanded for an award of

benefits. *See Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994); *Faucher*, 17 F.3d at 176.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **REVERSED** and the matter be **REMANDED** for an award of benefits pursuant to Sentence Four of 42 U.S.C. § 405(g).


Date:  3/20/20                    *s/Karen L. Litkovitz*
                                  Karen L. Litkovitz
                                  United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JERRY STILL,
    Plaintiff,

      vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:18-cv-837
Cole, J.
Litkovitz, M.J.

### NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).